**Williamsport Housing Authority v. Matthews**

*John R. Bonner,* for plaintiff.
*Kathleen Graham,* for defendant.

SMITH, *J.,* March 15, 1993—This case involves the eviction of a public housing tenant for repeated late payments. Defendant appealed the district justice's judgment in favor of the plaintiff, and a de novo non-jury trial was held before the court on February 24, 1993. Defendant does not deny that she repeatedly failed to pay her rent on time, but she blames that failure on a mental disability and claims that the plaintiff is required to make reasonable accommodations to enable her to continue to reside in public housing.

## FACTS

On July 13, 1990, Gale Matthews (plaintiff) entered into a lease agreement with the Williamsport Housing Authority (defendant), a public housing authority. The lease stated:

"Rent for the period beginning July 16, 1990 and ending at midnight July 31, 1990 shall be $58, payable not later than July 13, 1990. Thereafter, monthly rent in the amount of $116 must be paid in advance *and in one installment* (including any maintenance or damage charges, late charges, or collection costs which may be then due) on the first of each month beginning August 1, 1990.

"The payment of the full amount of the monthly rent and other charges when due and in *one installment,* is deemed to be a material term of this lease for which repeated violations shall be considered good cause for management to terminate or refuse to renew this lease." (emphasis in original) Plaintiff's exhibit no. 1, paragraph 3A.

Between the time of July 1990 and December 1991, a total of 17 months, Ms. Matthews failed to make timely rent payments 12 times. N.T., pp. 10-11, plaintiff's exhibit no. 2. Cheryl Starr, the employee who

collects and logs the rents, testified that the authority's procedure regarding late payment is to first send the tenant a proposed lease termination, which gives him or her five days to respond. After that, it sends out an eviction notice. N.T., p. 11. In Ms. Matthews' case, eviction notices were sent out 7 times.[1] N.T., p. 85. Ms. Matthews acknowledges that she received eviction notices, but maintains that she did not understand what they meant. N.T. pp. 27, 29.

Upon appeal from the district justice's judgment, a supersedeas was issued, and the defendant deposited $100 into the escrow account in the prothonotary's office pursuant to Lycoming R.C.P. L902, which states that the appellant file with the prothonotary a sum of money equal to the monthly rent due in the month the appeal is taken and each month thereafter until the matter is resolved. Because the $100 was not sufficient to meet the provisions of this rule, the supersedeas was terminated by the court on January 22, 1992, but was later reinstated by order of February 4, 1992, which stated, "Defendant shall deposit her future monthly rental payments with the prothonotary on or before the seventh day of each month." Since the February 4, 1992 order, there were three occasions when payment was not made by the seventh day of the month. In March 1992, the seventh fell on a Saturday, and Ms. Matthews paid on Monday, the ninth. In November 1992, she made a payment of $20 less than the $154 due, but the prothonotary's office gave her a receipt for the full $154. When it discovered its error, it notified Ms. Matthews and she paid the $20. N.T., pp. 39-40.

---

1. If there is already an outstanding eviction notice for the preceding month and the rent has not yet been paid for the current month, the authority does not send out a new eviction notice.

In January 1993, Ms. Matthews was unable to travel to the courthouse because she and her children were ill. The rent was paid on January 14th. N.T., pp. 31-33.

Ms. Matthews has an IQ of 71, and has been diagnosed by the Department of Health and Human Services as being borderline mentally retarded and having an adjustment disorder. In addition, she takes medication for depression. She receives Supplemental Security Income because of these impairments.

Ms. Matthews has received and is currently still receiving services from Children and Youth. Although testimony did not reveal when these services actually began, it is clear that they were instituted at the request of Ms. Matthews, and were being provided as early as September 1990, shortly after Ms. Matthews moved into the apartment. They continued throughout the time she was receiving eviction notices. These services included, and still include, an individual caseworker, who sees Gale at least once a week and has frequent phone contact with her, N.T. p. 58, and a Parent Partner, who saw Gale for three hour visits at least twice a week, N.T. pp. 71, 76. Neither of these social workers knew anything about Ms. Matthews' rent problems until the magistrate's hearing in December 1991. N.T., pp. 64-65, 74.

## DISCUSSION

Ms. Matthews argues that she cannot be evicted because of the protection provided for her as a handicapped[2] individual. "Handicap" is defined in 24 C.F.R.

---

2. The court is aware that the term "handicap" is not politically correct; however, because it is used in the statutes and regulations cited in this opinion, and because no consensus has been reached on a substitute, the court will use it interchangeably with "disabled."

§100.201 as "a physical or mental impairment which substantially limits one or more major life activities," and includes "any mental or psychological disorder, such as mental retardation." Ms. Matthews has been assessed as disabled by the Department of Health and Human Services Social Security Administration. The primary diagnosis is mental retardation, with adjustment disorder as a secondary diagnosis. The evaluating psychologist wrote the following comments regarding her handicap:

"The [client] has been diagnosed with borderline mental retardation and adjustment disorder. She is very dependent and would have marked difficulty concentrating. She could not perform SGA. Considering medical and vocational factors, [client] is found to be disabled." Defendant's exhibit no.1.

There is no question that this evaluation clearly fits the statutory definition of handicap. Thus the court finds that Ms. Matthews is a handicapped individual, and as such, is entitled to the protection afforded by The Fair Housing Amendments Act of 1988, 42 U.S.C. §3601 et seq. and the Department of Housing and Urban Development regulations found at 24 C.F.R. §100.201 et seq.

Under the Fair Housing Amendments Act, a landlord may evict a tenant with a disability if the tenant refuses or is unable to comply with the tenancy rules that apply to all tenants. 42 U.S.C. §3604(f)(a); 24 C.F.R. 100.202 (d). However, the Act goes on to state that if a reasonable accommodation would eliminate the threat or enable the tenant to comply with standard tenancy rules, the law requires the landlord to provide such accommodation and prohibits the landlord from refusing to make "reasonable accommodations and rules, policies, practices or services when such accommodations may be

necessary to afford [a disabled person] an equal opportunity to use and enjoy a dwelling." 42 U.S.C. §3604(f)(3)(B); 24 C.F.R. §100.294(a).

This protection, however, obviously applies only in cases where the handicap is the reason that the tenant cannot comply with the rules. Otherwise, disabled individuals could use their handicaps as an excuse to flagrantly violate any part of a lease they did not wish to comply with. Ms. Matthews clearly did not follow the rules set forth in the lease she signed with the Williamsport Housing Authority. The central question in this case is whether or not Ms. Matthews' handicap prevented her from paying her rent on time. This is a factual determination the court must make based on the evidence presented. The issue of reasonable accommodation applies *if and only if* the court finds that her mental disability caused the late payments.

Counsel for Ms. Matthews maintains that "[d]ue to the nature her [sic] disability (borderline intellectual functioning, adjustment disorder and depression) Ms. Matthews did not sufficiently understand that manner [sic] in which she had been making her rent payments to the housing authority was unacceptable." Defendant's amended brief, pp. 1-2. This is difficult for the court to accept.

The "rules" for paying rent were very simple: the rent must be paid in one installment, by or on the 1st of the month. This is not a terribly difficult concept, even for a person who is borderline mentally retarded. It is difficult for the court to believe that Ms. Matthews could not succeed in doing this. When asked to state her understanding of when she was supposed to pay the rent, Ms. Matthews answered:

"A. On the 7th when I got my check.

"Q. Was that after we came to court or before we came to court?

"A. Before, as far as I know." N.T., p. 27.

This testimony is simply not credible. Ms. Matthews attended school into the 11th grade. Although some of that time was spent in special education classes, an individual who went that far in the public school system should certainly be capable of understanding that rent must be paid by a given date. Indeed, it is difficult to imagine how an adult individual 28 years old with a family could have rented previous apartments without ever encountering rent payment deadlines.

Moreover, Ms. Matthews did fairly well as a witness, and demonstrated an ability to understand and answer questions which were at least as difficult as the concept of paying rent by a deadline. She also apparently understood the much more complex concept that when her income went down she was entitled to a reduction in her rent, for when her son left the household, she reported it; however, she somehow did not understand that when her income went up, her rent would also increase, for she failed to report that. N.T., p. 20.

Furthermore, if Ms. Matthews did not understand that the rent was due on the first of the month, the court cannot help but wonder what must have crossed her mind when she received the many eviction notices, which stated very clearly:

"The Williamsport Housing Authority hereby demands the inspection of your premises and further notifies you to vacate said premises no later than [date inserted], after which date we will proceed with eviction according to law which may result in your physical removal from the premises by the Sheriff of Lycoming County under a writ of possession." N.T., p. 85.

Ms. Matthews claimed that she did not understand what the notices meant, and that the first time she became aware that the Housing Authority was trying to evict her was when "a constable showed up at my door with some paper." N.T., p. 29. Even if it were true that she did not understand the eviction notices, the phrases "eviction," "physical removal from the premises," and "sheriff" should have alerted even a borderline mentally retarded individual to the fact that something was wrong. She could have asked her two social workers for help, yet she did not. The fact that she had voluntarily gone to Children and Youth to request their services shows that she is indeed capable of asking for help when she senses there is a problem with which she needs assistance. Why she did not ask for help regarding her rent problem is a mystery.

But even if the court were to find that Ms. Matthews actually believed the rent was due on the seventh, the court would still find that she deliberately breached the contract because she did not comply with this deadline, either. The evidence shows that most of the delinquent payments were made much later than the seventh of the month. Plaintiff's exhibit no. 2. Ms. Matthews' own attorney brought out this contradiction on direct examination:

"Q. Why didn't you make your payments then on or before the 7th all the months that you lived in the housing authority?

"A. I paid it half and half like I have always. I thought that was all right.

"Q. You would make your payments in two payments?

"A. Yes." N.T., p. 27.

Again, the record shows that this was simply not true. Plaintiff's exhibit no. 2. Sixteen out of the seventeen payments were made in one installment.

Thus the court can only conclude that Ms. Matthews' testimony is not credible, and that she fully understood that the rent payment was due on the 1st of the month, in one installment. For some reason, which the court will not venture to speculate on, she was unwilling to comply with the lease.

In fact, even when judgment was entered against her at the district justice level, and she had to pay her rent at the prothonotary's office in order to remain in her apartment pending the appeal, she still was late making the payments three times. In only one of these instances does the court hold her blameless: On November 6, 1992, she made a deposit in the prothonotary's office and was given a receipt for $154. She was subsequently notified that an additional $20 was needed, and she brought the money in. In March 1992, Ms. Matthews paid her rent on the ninth, because the seventh fell on a Saturday. This did not change the fact that the rent was due on the seventh; she should have brought it in on the sixth. During the first two weeks of January 1993, Ms. Matthews and her children were ill, yet she was taken to the hospital by someone who could have easily stopped by the prothonotary's office on the way to or from the hospital. Or she could have asked one of her Children and Youth workers to take the money in for her.

Ms. Matthews' counsel clearly agrees that after the district justice hearing the defendant understood that the rent had to be paid by the seventh in the prothonotary's office. Yet she did not comply—even when she was in

the precarious situation of losing her apartment during the appeal if she made late payments, and even while she was being watched and presumably monitored by Susquehanna Legal Services and her social workers. This only goes to reinforce the court's conclusion that although Ms. Matthews understood her responsibility, she would not, even under the most extreme circumstances, always carry it out.

Counsel for defendant argues that the Housing Authority should be required to give Ms. Matthews another chance, now that the Department of Children and Youth is aware of the rent problem, and suggests that it should contact the Department of Children and Youth and/or the particular social workers when the rent is not paid on time. But if the court were to do this by finding in favor of the defendant, it is not unlikely that after the specter of an impending eviction was removed, Ms. Matthews would again refuse to pay her rent on time.

To ask the Housing Authority to rely on Children and Youth to make things right is unreasonable for two reasons. To begin with, the housing authority has no way to ensure that these services will continue. Already, Ms. Matthews is losing her parent partner, N.T., p. 67, and there is no telling how long she will continue to have a caseworker or attend counseling, since budget cuts are being made. Moreover, these activities are apparently voluntary on Ms. Matthews' part, and she could choose to end them at any time. Secondly, Children and Youth has no authority to take money from a client for the payment of a bill or to act as a payee for a client. N.T., p. 109. Ms. Matthews could simply refuse to pay her rent on time, and there would be nothing Children and Youth could do about it.

If Ms. Matthews is given yet another chance and continues in the same behavior pattern as before, the Housing Authority would have to start the eviction process anew, and Ms. Matthews might continue to remain in her apartment for another two years at least. It is unreasonable to put this onus on the Housing Authority after a person has proven over and over again that she is unwilling to comply with its most basic rules. The Williamsport Housing Authority should not have to *indefinitely* go to the time, trouble, and expense of sending out eviction notices month after month after month when the rent is not paid on time. Eventually, after due process of course, the Housing Authority must be allowed to evict such tenants.

Living in public housing is a privilege—not a right. It is an important and worthwhile program paid for by public tax dollars to help those in financial distress. Ms. Matthews is living in a five bedroom apartment, and has been paying rent which fluctuated between $116.00 and $255.00, increasing only when her income increased. This is a bargain by anyone's standards, and Ms. Matthews should have been happy to comply with the rules in order to enjoy this benefit.

Moreover, it appears that having the money to pay the rent was not the problem. She had sufficient income from public assistance and SSI to meet her needs. It is incomprehensible to the court how a woman who receives enough money from the government to pay her rent and lives in a government-subsidized apartment for such a low price could show only disdain and contempt for the rules of the Williamsport Housing Authority, which enabled her to enjoy these benefits.

Unfortunately, public resources are not unlimited. If our society is going to be able to continue to offer public housing assistance, these facilities must receive the co-operation of their tenants. The basic rules and regulations which allow public housing developments to function effectively and efficiently must be respected and followed.

Those disabled individuals who genuinely want to comply with the rules but are unable to because of a handicap should be accommodated so that they can remain in public housing. Those who are able to comply but choose not to do so do not deserve this privilege. Their apartments should be given to those who demonstrate their appreciation and respect for the system by complying with the basic rules which are necessary in order for the government to offer this program.

## CONCLUSION

For the reasons stated in this opinion, the court finds that Gale Matthews fully understood her obligations under the lease but did not fulfill them. Because her disability was not the cause of her breach of the lease, the question of Williamsport Housing Authority providing reasonable accommodations for her disability is irrelevant. Thus the following will be entered:

## ORDER

And now, March 15, 1993, judgment is entered in favor of Williamsport Housing Authority, plaintiff, and against Gale Matthews, defendant, and it is ordered that possession of Unit 163, 2937 King Court, is awarded to plaintiff.